THURSTON v. DETROIT ASPHALT & PAVING CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—PART-NERSHIP—NOTICE.

That defendant corporation's manager contracted with one member of a partnership for the painting of its smoke-stack without knowing that he was dealing with a partnership would not preclude the defense that the other member, who was injured while painting the smoke-stack, was not entitled to receive compensation therefor under the workmen's compensation act (sections 7 and 10a, pt. 1, Act No. 173, Pub. Acts 1921) because he was a partner not receiving wages irrespective of profits.

2. PARTNERSHIP—CONTRIBUTION OF SKILL AND LABOR SUFFICIENT TO CONSTITUTE PARTNERSHIP.

Evidence that plaintiff and another engaged together in "steeple-jack" work, and that each contributed skill and labor and received a certain per cent. of whatever was made, but no fixed amount as wages, held, sufficient to establish a partnership, although plaintiff contributed no property thereto.

3. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—PART-NERSHIP—PARTNER NOT RECEIVING WAGES NOT ENTITLED TO COMPENSATION.

A partner who received a percentage of what the partnership made, but no wages irrespective of profits, was not entitled to compensation under the provisions of sections 7 and 10a, pt. 1, Act No. 173, Pub. Acts 1921, for an accidental injury received while executing a contract for the painting of a smoke-stack taken by his copartner.

Certiorari to Department of Labor and Industry. Submitted January 9, 1924.    (Docket No. 22.)    Decided April 10, 1924.

Albert Thurston presented his claim for compensation against the Detroit Asphalt & Paving Company for an accidental injury in defendant's employ.    From

On the question as to whether members of partnership are employees within the meaning of workmen's compensation acts, see note in L. R. A. 1918F, 204.

an order awarding compensation, defendant and the State Accident Fund, insurer, bring certiorari. Reversed, and order vacated.

*Kerr, Lacey & Scroggie,* for appellants.

STEERE, J.   Prior to April 22, 1922, the superintendent of defendant Detroit Asphalt & Paving Company let an oral contract to one Frank Preston to paint the smoke-stacks of the company's plant for $47. There was no definite agreement as to when the work should begin or end, nor details of how it should be done.   The contract was for results without provision for supervision or any direction of the work by the company.   Plaintiff Thurston was a brother-in-law of Preston and a silent partner, as he testified, in the business of painting smoke-stacks, putting up awnings, etc.   On April 22, 1922, while Thurston was at work painting one of the company's smoke-stacks he fell and was injured, his most serious injury being a compound fracture of his left arm.

The first knowledge which came to the company that he was working upon this job was when he fell. When defendant's superintendent was informed that a man had fallen while at work on one of the smoke-stacks and was injured he immediately went to him, saw that he was given first aid and then taken to a hospital, where he was confined for between three and four weeks.   The testimony showed that the accident resulted in permanently crippling his left arm and hand so that he was thereafter unable to engage in the line of work he was doing when injured.   He instituted these proceedings under the workmen's compensation act to recover compensation from defendants, and was awarded by the commission $14 per week during the period of total disability, $372 being found then due together with medical and

hospital bills amounting to $221.75 which was also awarded.

The award was made on the theory that Thurston was an employee of Preston, defendant's contractor, and injured while engaged under him in carrying out his contract with the asphalt paving company. The amended act makes the principal liable for an industrial accident sustained by an employee of a contractor or subcontractor not subject to the act while engaged in performance of the contract. The amendments involved here appear as sections 7 and 10*a*, of part 1, Act No. 173, Pub. Acts 1921 (Comp. Laws Supp. 1922, §§ 5429, 5430 [2]).

The only questions calling for consideration are whether there was a partnership between Thurston and Preston, who secured the contract, and if so was Thurston a working member of the partnership "receiving wages irrespective of profits from such" contract. Section 7 of part 1 of the amended act, which immediately precedes section 10*a*, provides in part:

"The term 'employee' as used in this act shall be construed to mean:  *   *   *

"2. Every person in the service of another, under any contract of hire, express or implied, including aliens (including working members of partnerships, receiving wages irrespective of profits from such)," etc.

In its findings the commission emphasizes the fact that defendant's superintendent did not know of Thurston or that he was contracting with Preston as the representative of a partnership, saying:

"The testimony of the superintendent establishes conclusively that neither Preston or Thurston held themselves out to respondent employer as partners. It has also been held that participation in the profits of a business does not constitute a partnership. To create a partnership there must be a community of property, a community of interest, a community of profits. If either element is lacking there is no part-

nership. *Brotherton* v. *Gilchrist,* 144 Mich. 274 (115 Am. St. Rep. 397). In the case before us, there was certainly no community of property. The most we think that can be said of the arrangement is that the applicant's wages were determined by the extent of the profits."

The fact that defendant's manager contracted with Preston without knowing that the latter was representing a partnership does not necessarily preclude the defense that Thurston was a partner not receiving wages irrespective of profits which the partnership might make.

"It is not essential to a partnership that it should be public, or known to the world. All rights acquired, and all debts incurred by it are partnership rights and liabilities, whether the persons dealing with it had notice of the partnership or not. If ignorant of its existence at the time, a subsequent discovery works no injury to them." *Gray* v. *Gibson,* 6 Mich. 300, 324.

It is wide of the mark to adopt community of property as a conclusive test of a partnership such as this is claimed to be. What these two men put together into a common stock for the purpose of carrying on their partnership business was skill and labor. The basis of a partnership is a community of interest, not necessarily property, in the agreed business undertaking. Partnership is a legal entity separate from the individuals composing it, and its essential elements are their contribution to it of whatsoever nature, whether capital, consisting of money, merchandise, etc., or credit, skill or labor. These elementary principles are concisely stated and illustrated in Parsons on Partnership (4th Ed.), § 63, as follows:

"It is certainly not necessary that each partner should bring into the common stock both labor and property. It is a familiar principle, quite frequently put in practice, that one or more of the partners may contribute money alone, while one or two others may contribute labor and money, or labor alone. And indeed all may contribute labor and none money."

In *Beecher* v. *Bush,* 45 Mich. 188 (40 Am. Rep. 465), where the principles of partnership are discussed instructively, this court said in part, speaking through Justice COOLEY:

"But every doubtful case must be solved in favor of their intent. * * * It must be admitted, however, that the attempts at an application of the test to the complicated facts of particular cases have not been productive of harmonious results."

Thurston's undisputed testimony shows that he and Preston had been for about 12 years engaged in carrying on together an industry which he called "steeple-jack work" consisting of painting smoke-stacks, ventilators, cooling towers, store fronts, taking down and putting up awnings, etc., during all of which time they devoted their labor and skill to that business and divided the net proceeds on the basis of 60 per cent. to Preston and 40 per cent. to Thurston in whatever line they were working. The latter's testimony shows the elements of a partnership, in which he says he was a silent partner. Asked by his counsel on direct-examination, "What wages do you receive for painting stacks?" he replied:

"Well, he got 60 per cent. and I got 40 per cent. of whatever we make. * * *

"*Q.* I asked you your daily wage, Thurston?

"*A.* Oh, say $8.

"*Q.* That is the average daily wage that you would make in that line of work?

"*A.* Yes, sir."

This went no further than stating that his share of the profits yielded him that amount. The reason he gave for the difference in percentage of their division, and indirectly for his calling himself a *silent* partner, was that Preston furnished the rigging, interviewed the people and got the jobs, at which he himself "was not any good." On cross-examination he was asked and answered:

"*Q.* And your agreement with Thurston (Preston) that whatever was gotten out of the jobs wherever you used his equipment, you would go 60-40?

"*A.* It was the agreement all the way through whatever we done.

"*Q.* Well, that did not apply where there was not any equipment to be used, did it?

"*A.* Yes, sir, everything.

"*Q.* No matter whether you used his equipment or whether you did not use any equipment at all?

"*A.* Whether we used his or no."

The rigging as described by him was apparently not elaborate or expensive. It consisted of ropes and tackle with hooks to attach it to the top of whatever they were painting, so arranged that the painter who began his work at the top could conveniently be raised and lowered in a boatswain's chair, which was made by looping and securely fastening a rope around the ends of a piece of plank about two feet long so that it furnished a seat in which the painter could sit while at work. Of the rigging Preston furnished and their expenses in doing the job, plaintiff was asked on cross-examination and answered as follows:

"*Q.* You only need a rope and the thing that goes over the top and your seat to sit on?

"*A.* There is three or four of them.

"*Q.* That is, you need more of the same kind?

"*A.* Well, generally two of us go as a general thing.

"*Q.* Each one assists the other in going up?

"*A.* Well, we generally have some one on the ground, so if we want anything when we get up on top he can send it up to us.

"*Q.* I am not talking about your equipment—the thing you need is a rope probably twice as long as your smoke-stack is high?

"*A.* Well, we generally carry a rigging that will reach a hundred feet, and there are four ropes.

"*Q.* And a tackle?

"*A.* Two—a single block and a double block.

"*Q.* Yes.

"*A.* And also hooks.  *  *  *

"*Q.* So that when you had the third man on the job

you would go to work then, and pay that man out of the proceeds that you got from the whole job and then split 60-40 on the balance?

"*A.* Yes, sir.

"*Q.* Now, when it came to buying the paints and things like that, what did you do then?

"*A.* It came out of the same thing.    *    *    *

"*Q.* Well, suppose, I am saying suppose there was 10 gallons of paint and you paid $4 a gallon, that would be $40 you would pay for the paint, and then divide the balance 60-40.    That was the rule that applied to all the expenses such as paint, or extras, I will say or anything else that might come in?

"*A.* Yes, sir, but the paint did not cost that much.

"*Q.* Yes, I know that, but that was the rule you figured on?

"*A.* We figured enough when we had to furnish the paint, we had to figure a little more on a job than what it is on a job where they furnish the paint themselves."

The undisputed testimony shows a community of interest for business purposes in a vocation which these men had carried on together for years, with a united contribution of skill and labor and division of profits, which compasses the essentials of a partnership.    In those essentials the two men were on an equal footing.    Each was a working member of the partnership and each received no wages irrespective of profits.    That Preston received a larger percentage in their division of profits, because he owned and contributed the use of some rigging for a certain class of their work and was more capable in securing contracts, is immaterial.    Division of profits on the basis of contributions, whether capital, facilities, or labor, is a customary provision of partnership contracts.

The decision of the commission is reversed and its award must be set aside.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.