760 So.2d 170 (2000)
Daniel LIPSIG, Nasim Rahman and Miami Columbus, Inc., Appellants/Cross-Appellees,
v.
Zahid A. RAMLAWI, Appellee/Cross-Appellant.
Nos. 97-1890, 97-1819.
District Court of Appeal of Florida, Third District.
March 29, 2000.
Rehearing Denied June 14, 2000.
*173 Kluger, Peretz, Kaplan & Berlin, P.A. and Gregory P. Borgognoni; Thompson, Muraro, Razook & Hart, P.A.; Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin *174 & Perwin, P.A. and Joel S. Perwin, for appellants/cross-appellees.
Russo, Wells & Associates, P.A., and Elizabeth K. Russo, and Linda Ann Wells, for appellee/cross-appellant.
Before COPE, GREEN, and SHEVIN, JJ.
GREEN, J.
This consolidated appeal and cross-appeal arise from a final judgment entered after a lengthy trial involving a business dispute between appellants, Amin, Diana and Hassan Dahlawi[1] and appellee, Zahid Ramlawi ("Ramlawi").

I. Procedural History

In September 1990, the Dahlawis brought suit in the name of Miami Columbus, Inc. ("Miami Columbus") f/k/a Zaminco Columbus; Express Premium Finance Company, Inc. ("Express Premium") and Aminco International, Inc. f/k/a Zaminco International, Inc. ("Zaminco") against Ramlawi, seeking, among other things, the return of excess salaries, the repayment of outstanding loans, and the return of personal property. Ramlawi counterclaimed for breach of a partnership agreement, defamation, tortious interference with a business relationship and sought to recover monies for deferred salaries, severance, vacation benefits, and the return of monies that Ramlawi allegedly advanced to the various partnership companies. Ramlawi also sued Daniel Lipsig ("Lipsig"), an attorney who represented the Dahlawi family in their various business ventures, for tortious interference with the alleged partnership relationship, and for conspiracy to deprive Ramlawi of his partnership interest. Ramlawi sued Nasim Rahman ("Rahman"), an employee of Zaminco, for conspiracy to deprive Ramlawi of a partnership interest. In addition, Ramlawi sued Lipsig and Rahman for slander and brought a vicarious liability claim against Amin and Hassan Dahlawi for Lipsig's and Rahman's alleged slander, as well as several other tort and contract claims. Further, Ramlawi was permitted to amend his counterclaim to seek punitive damages for the slander claims.
At a pretrial conference, the trial court made a number of rulings, including a finding that if a partnership between the Dahlawis and Ramlawi was found to exist, any resulting accounting would be performed by the jury. By writ of certiorari, however, this court quashed that ruling holding that "[i]n a partnership dispute, the appropriate remedy is a formal accounting of the partnership affairs," to be tried in equity by the trial court. Dahlawi v. Ramlawi, 644 So.2d 523, 524 (Fla. 3d DCA 1994).
Thereafter, following a forty-nine (49) day jury trial, spanning over four and one-half (4½) months, the jury found against the appellants and in favor of Ramlawi on all but one of his claims. The jury concluded, among other things, that an oral partnership had been formed between Ramlawi and the Dahlawis, and that this partnership included five companies[2]; that *175 Ramlawi was defamed on three occasions, entitling him to $175,000 against each tortfeasor; and that Hassan and Amin were vicariously liable for two of the claims of defamation. The jury also awarded Ramlawi punitive damages totaling $10,000,000. The trial court denied all post-trial motions except for Lipsig's and Rahman's motions to reduce the punitive damage awards to three times the compensatory damages, pursuant to section 768.73, Florida Statutes (1995).
Thereafter, the Dahlawis appealed the jury's finding of liability under rule 9.130(a)(3)(C)(iv), Florida Rules of Appellate Procedure.[3] This court dismissed that appeal as premature. See Miami Columbus, Inc. v. Ramlawi, 687 So.2d 1378 (Fla. 3d DCA 1997). Specifically, this court held that "[w]e dismiss the appeal without prejudice for lack of jurisdiction because, for a number of reasons, we conclude that the liability verdicts do not qualify as reviewable orders under the rule." Id. at 1379.
During the pendency of the appeal, the trial court commenced an accounting of the five companies that the jury had found were partnership companies. All parties were given the opportunity to submit evidence, including financial statements and expert testimony. On February 26, 1996, the trial court valued Ramlawi's partnership interests at $1,389,565. Both parties filed motions for rehearing, and the trial court entered an order reducing Ramlawi's partnership interests to $1,323,065. Finally, on June 12, 1997, the trial court entered its final judgment reflecting both the jury's verdict and the court's findings from the accounting. This appeal and cross-appeal followed with numerous issues being raised. The facts pertinent to the individual issues on appeal and cross-appeal will be recited separately.

II. Main Appeal

A. Partnership Issues
The appellants argue that the trial court erred in failing to direct a verdict in their favor on all of the claims relating to an alleged oral partnership between them and appellee Ramlawi. When determining the propriety of the granting (or denying) of a directed verdict, we must determine whether the facts, when viewed in a light most favorable to the non-moving party, here Ramlawi, provided a prima facie case of an oral partnership as provided for under law, here Michigan law.[4]See Houghton v. Bond, 680 So.2d 514, 522 (Fla. 1st DCA 1996) (holding that "[a] motion for directed verdict should not be granted unless the trial court, after viewing the evidence in the light most favorable to the non-moving party, determines that no reasonable jury could render a verdict for the non-moving party"). See also Woods v. Winn Dixie Stores, Inc., 621 So.2d 710, 711 (Fla. 3d DCA 1993)(stating that "[i]n determining a motion for directed verdict, the evidence, and all reasonable inferences, therefrom, must be viewed in a light most *176 favorable to the nonmoving party."). Based upon our careful review of the record evidence, we do not agree that the denial of the motion for directed verdict on this issue was error.
The facts, viewed in the light most favorable to Ramlawi, show that in 1979 Amin Dahlawi and his wife Diana, visited Ramlawi at his Detroit home. During this visit, Amin and Ramlawi discussed their business experiences and aspirations for the future. Thus, in 1980, when Ramlawi found a medical center that he was interested in acquiring he contacted Amin who told him "we're brothers and we would be partners. Let's do it together ... I'd like to be a partner in this property."
Ramlawi further testified that he and Amin decided to go into business together:
Our line of thought was going in the direction where we both can benefit out of it with my presence here, my experience, and my ability, and his ability to create opportunities in the Middle East, in Saudi Arabia, and his willingness, and his desire to expand investments, and to expand into business in the U.S.
For both of us it was beneficial that we both, together, join forces or put out abilities together, and form some kind of a relationship, business relationship, and this was mainly on businesses that he thought would be good to be taken there, and good for businesses to be started here. That was basically the frame of the discussions.
Ramlawi also testified that he and Amin agreed to work together on a 50/50 partnership basis.
Ramlawi and Amin went to California to inspect land that one of Ramlawi's friend was developing. While there, they met with Hassan, Amin's brother, and told him that the two of them had become partners. Amin returned to Michigan to discuss other projects that Ramlawi had in mind for the partnership to undertake. At that time, Ramlawi and Amin confirmed that they were equal partners in the ventures to take place in this country and in Saudi Arabia; they also agreed that Amin would contribute the capital when needed and that Ramlawi, in turn, would contribute his time, effort and experience toward identifying projects, and in promoting and managing the day-to-day operations of the partnership. They also decided that they would conduct the partnership's business through a corporation in an effort to limit the partners' liability.
Shortly thereafter, Hassan came to Detroit, was advised of the partnership's intention to use a corporation to conduct its business, and was invited by Amin and Ramlawi to join the partnership. Before Hassan decided whether he was going to join the partnership, Ramlawi began to move forward with projects for the partnership.[5] Within days, Hassan decided to join the partnership. Ramlawi suggested that both he and Amin share part of the partnership with Hassan. Specifically, Ramlawi testified that:
I said, "No." I think we will split it among ourselves. And you are going to be putting in capital since you are going to be in support of this relationship with capital financing, you will get 30 and I will get 30 and he will get 30.
Diana, Amin's wife, was offered the remaining 10 percent of the partnership. The Dahlawis (Amin, Hassan and Diana) and Ramlawi agreed to form a corporation as a vehicle for the operation of the partnership's business. They named the corporation Zaminco, after Zahid Ramlawi and Amin Dahlawi.[6]
*177 The partners agreed that Ramlawi would manage the day-to-day operations of the partnership because the Dahlawis had no time. However, all decisions regarding what ventures the partnership would undertake had to be unanimous. The partners also agreed, that partnership distributions would be made only upon the agreement of each partner and in accord with each partner's interest.
Under Michigan law, the elements of a partnership generally include:
[A] voluntary association of two or more people with legal capacity in order to carry on, via co-ownership, a business for profit. Co-ownership of the business requires more than merely joint ownership of the property and is usually evidenced by joint control and the sharing of profits and losses.
Miller v. City Bank & Trust Co., N.A., 82 Mich.App. 120, 266 N.W.2d 687, 690 (1978). However, in Michigan, the most important factor in determining whether a partnership exists is the intention of the parties, and whether such an intention exists is a question of fact which is based on the circumstances of each case. See, e.g., Bernstein, Bernstein, Wile & Gordon v. Ross, 22 Mich.App. 117, 177 N.W.2d 193, 195 (1970) (holding that "[t]here is no general rule which will afford an automatic solution of the question of the existence of a partnership relation, ... but such solution turns upon the facts and circumstances of association between the parties. The intention of the parties is of prime importance in considering whether a partnership exists.") (citations omitted); see also Barnes v. Barnes, 355 Mich. 458, 94 N.W.2d 829, 831 (1959) (concluding that "At the present time no test is conclusive, though in modern law the factor of the intent of the parties, gauged by the legal effect of their agreement, bulks large."). Moreover, under Michigan law, the existence of a partnership may also be proved by merely showing a "[c]ontribution to [the partnership] of whatsoever nature, whether capital, consisting of money, merchandise, etc., or credit, skill or labor.'" Michigan Employment Sec. Comm'n v. Crane, 334 Mich. 411, 54 N.W.2d 616, 619 (1952) (quoting Thurston v. Detroit Asphalt & Paving Co., 226 Mich. 505, 198 N.W. 345 (1924)).
The Michigan courts have consistently held that the parties' use of the term "partner" to describe themselves and/or their relationship is clear evidence of a partnership. See Armstrong v. Potter, 103 Mich. 409, 61 N.W. 657 (1894)(use of term "partner" is competent evidence of a partnership). Other indicia of partnership include evidence that a party had a right of management, contributed monies, and agreed to share profits. See, e.g., Falkner v. Falkner, 24 Mich.App. 633, 180 N.W.2d 491, 496-97 (1970)(sharing profits or losses, use of term "partner," and rights of management are indicia of a partnership); Ross, 177 N.W.2d at 195 (sharing of profits and references to "partner" constitute evidence of a partnership).
In Armstrong, the Michigan Supreme Court held that "testimony that each defendant had admitted that they were in partnership ... justified the submission of the question to the jury," even though the defendants had denied making such admissions and both testified to facts which, if believed, showed that they were not partners. 61 N.W. at 657-58. Similarly, in Barker v. Kraft, 259 Mich. 70, 242 N.W. 841 (1932), the court held that the defendant's testimony that plaintiff said they should go into partnership, that he and plaintiff did go into a partnership, and that he was to earn half of all that was made out of the partnership was sufficient to require submission of the partnership issue to the juryeven though the plaintiff denied that any partnership agreement *178 was made or even talked about. Id. at 842-43.
In this case the evidence of a partnership is far more compelling than either Armstrong or Barker. Ramlawi testified that he and the Dahlawis expressly agreed to form a partnership and to share profits. Ramlawi also stated that he was supposed to contribute his time and services while the Dahlawis were going to provide the funding for the partnership ventures. Furthermore, there was evidence that the parties had general discussions about the sharing of liability; and that Ramlawi would have day-to-day control over the operation of the partnership. Amin and Hassan both admitted that Ramlawi had the authority to represent the partnership's interests in Florida. In fact, Amin specifically admitted in his deposition that he and Ramlawi were partners in Zaminco. In addition, several independent witnesses testified that the Dahlawis had represented to them that Ramlawi was their business partner. Finally, the evidence showed that Ramlawi contributed capital to the partnership on an ongoing basis by actually paying expenses, pledging credit, and deferring payment of sums he was owed.
Given this evidence, we find that there was sufficient indicia of a partnership relationship, under Michigan law, between Ramlawi and the Dahlawis. Thus, we find that the trial court was correct in submitting the issue of the existence of a partnership to the jury.

B. The Trial Court's Accounting of the Value of the Partnership and its Companies.
The jury, in its verdict, concluded that the following five companies were part of the partnership between Ramlawi and the Dahlawis: Vista Finance Corporation; Express Premium Finance, Inc.; American Vehicle Insurance Company; Miami Freedom Tower, Inc.; and Miami Columbus, Inc.[7] Pursuant to this court's holding in Dahlawi, 644 So.2d at 524, the trial court performed an accounting of the partnership giving value to these five companies, and the court also valued Zaminco as the management company through which the partnership had been managed. All of the companies were valued as of December 31, 1989, the date that the jury found that the Dahlawis had breached the partnership agreement with Ramlawi.
The accounting trial was conducted December 5, 6, 8, 1995 and January 4, 5, 1996more than a year after the jury trial was concluded. The trial judge, in his Order Concerning Accounting, set out the factual determinations of the jury that governed the equities in the accounting phase of this case.[8] Specifically, the trial judge found that:
At the conclusion of the lengthy trial, the jury determined, among other things, that: (1) the Dahlawis' claims against Ramlawi were unsupported; (b) Ramlawi's position was correct that he and the three Dahlawis had in fact formed a partnership which encompassed all the businesses Ramlawi was managing; (c) Ramlawi had fully performed all of his obligations but that the Dahlawis had breached their obligations; (d) that the Dahlawis further fraudulently concealed their breach from Ramlawi, breached their fiduciary duty to him, conspired to exclude him from the partnership, and that they and their associates and corporations had wrongfully converted the partnership's assets to their own use; (e) the Dahlawis had directly and through others, caused Ramlawi $ 525,000 in compensatory damages and were responsible for $10,000,000 in punitive damages; and (f) that the Dahlawis were otherwise responsible to Ramlawi for $656,000.
*179 The Dahlawis' position at the accounting trial, and here again on appeal, is that the books, records, and financial statements of the companies which the jury found comprised the partnership, should for the most part, be disregarded insofar as they do not have any relation to the actual valuation of the companies' assets. Moreover, the Dahlawis also argue that certain entries should be recharacterized to attribute greater amounts in capital contributions and loans from the Dahlawis. The Dahlawis put on five witnesses, none of whom assigned a monetary value to the partnership. The Dahlawis also presented the financial statements of the five companies, prepared by two different CPA firms. Ramlawi, on the other hand, presented an expert's testimony on the valuation issues.
In reaching its initial valuation of the partnership in the accounting proceedings, the trial court assigned individual valuations to each of the partnership companies, made certain adjustments, and then netted the individual companies' valuations into one number which he found to be the value of the partnership as of December 31, 1989, the determined valuation date. Specifically, the court found the following:

 Property Value
1. Miami Columbus 0
2. Freedom Tower ($12,514,510)
3. American Vehicle $ 6,961,124
4. Express Premium $ 1,325,062
5. Adjustments for reduction
 in liabilities $ 3,038,062
6. Bonds $ 5,800,000
7. Zaminco $ 24,930
 ___________
 Total $ 4,635,215
 .30
 ___________
 Ramlawi's Interest $ 1,390,565

Following the issuance of the trial court's initial February 26, 1996 Order Concerning Accounting, where Ramlawi's interest in the partnership was found to be $1,390,565, as set out above, the Dahlawis requested that several of the jury verdict awards made against the partnership companies be combined into a single total, and that the total be used to reduce the partnership value.[9] These verdict amounts were combined by the trial judge into a lump sum of $465,500 which the judge used to reduce the value of the partnership and thereafter Ramlawi's 30% interest therein. The judge also added in certain deferred compensation amounts, which Ramlawi was entitled to, totaling $72,000. Making these modifications, and rejecting any other contentions of the parties, the trial judge entered his August 9, 1996 order entitled Additional Findings With Respect to Accounting. The final award to Ramlawi regarding his partnership share based on the accounting was $1,323,065.
The Dahlawis, on appeal, and Ramlawi on his cross-appeal both argue that the trial court erred and departed from established partnership law in valuing Ramlawi's partnership interest.
In cases of equity, such as an accounting,
[t]he findings of the trial court, as the trier of fact, come to this court clothed with a presumption of correctness, and where there is substantial competent evidence to sustain the actions of the trial court, the appellate court cannot substitute its opinion on the evidence but rather must indulge every fact and inference in support of the trial court's judgment[.]
Seredy v. Racansky, 743 So.2d 1127 (Fla. 4th DCA 1999)(quoting Smiley v. Greyhound Lines, Inc., 704 So.2d 204, 205 (Fla. 5th DCA 1998)). See also, e.g., Arison Shipping Co. v. Klosters Rederi A/S, 259 So.2d 784, 787 (Fla. 3d DCA 1972) (in cases involving appointment of receiver, findings of court of equity come to the reviewing court clothed with presumption *180 of correctness and decision will be overturned only upon showing of an abuse of discretion); Strickland v. Jacobs, 235 So.2d 747, 748 (Fla. 1st DCA 1970) (in child custody cases, equity cases, an order appealed comes to appellate court clothed with a presumption of correctness). See also Bird Rd. Commercial Sites, Inc. v. Feldstein, 214 So.2d 658, 660 (Fla. 3d DCA 1968)(stating that "the findings of a court of equity come to an appellate court clothed with the presumption of correctness that requires a clear showing of abuse to be overturned."). Here, the trial court was faced with conflicting financial reports and interpretations thereof, plus the usual discrepancy of allegations between the parties. His accounting determinations were based on all the evidence presented and his closeness to the case. Based upon the record before us, we do not find that the parties have demonstrated that the trial court abused its discretion in its accounting determinations. Thus, we affirm the accounting portion of the final judgment.

C. Tortious Interference and Conspiracy Claims
In yet another count in his counterclaim, Ramlawi sued the Dahlawis, Lipsig and Rahman for conspiring to exclude him from the partnership and for tortiously interfering with the partnership agreement. The jury returned a verdict in his favor on this count. As part of their main appeal, Lipsig and Rahman argue that the trial court erred by not directing a verdict in their favor on this count because they were employees acting within the scope of their duties and therefore it was impossible for them to conspire with their employer to tortiously interfere with Ramlawi's and the Dahlawis' partnership agreement.
Ramlawi's conspiracy and tortious interference claims were based upon the following allegations. In 1989, Amin decided that he did not want to be Ramlawi's partner. Hassan agreed with this decision. Ramlawi was not informed of Amin and Hassan's desire to remove him from the partnership. While Ramlawi was in California, Lipsig secretly traveled to Miami to gather documents on various partnership projects. While in Miami, Lipsig met with Rahman and shortly after this meeting, in mid-January of 1990, Rahman was transferred to Saudi Arabia to become the Dahlawis' personal assistant.
In late January of 1990, the Dahlawis, Lipsig and Rahman began inundating Ramlawi with demands for information concerning the financing of the Miami project and the expenditures of Zaminco and other companies. Also around this time period, Lipsig began sending Ramlawi faxes which restricted his authority. In February of 1990, Amin and Hassan explained their actions by telling Ramlawi that they wanted to be more involved in the decision making process of the partnership's various ventures. Ultimately, on April 2 or 3, 1990, Lipsig presented Ramlawi with a letter of resignation. Initially, Ramlawi refused to sign the letter but he eventually signed it because Lipsig assured him that his resignation from the day-to-day management of the partnership companies would not affect his interest in these companies. Finally, on May 21, 1990, the Dahlawis sent Ramlawi a directive advising him to cease all activities on Zaminco's behalf.
This court has held that "[a] civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Raimi v. Furlong, 702 So.2d 1273, 1284 (Fla. 3d DCA 1997) (citations omitted), rev. denied, 717 So.2d 531 (Fla.1998). Generally speaking, neither an agent nor an employee can conspire with his or her corporate principal or employer. See Rivers v. Dillards Dept. Store, Inc., 698 So.2d 1328, 1333 (Fla. 1st DCA 1997); Cedar Hills Properties Corp. v. Eastern Fed. Corp., *181 575 So.2d 673, 676 (Fla. 1st DCA 1991); Garrido v. Burger King Corp., 558 So.2d 79, 81 (Fla. 3d DCA 1990); American Credit Card Tel. Co. v. National Pay Tel. Corp., 504 So.2d 486, 488 (Fla. 1st DCA 1987). An exception to this rule however, is where "the agent [or employee] has a personal stake in the activities that are separate and distinct from the corporation's interest." Cedar Hills Properties Corp., 575 So.2d at 676; see also Greenberg v. Mount Sinai Med. Ctr. of Greater Miami, Inc., 629 So.2d 252, 256 (Fla. 3d DCA 1993).

1. Lipsig's Status
We find that Lipsig was the Dahlawis' agent at the time that this purported conspiracy took place. Clearly, Lipsig acted on behalf of and at the direction of the Dahlawis. Amin and Hassan, for whatever reason, decided that they did not want Ramlawi to be affiliated with the many Dahlawi family enterprises. They sought and obtained legal advice from Lipsig on how to proceed in excluding Ramlawi from the various companies. Amin and Hassan unquestionably had the right to seek Lipsig's legal advice in this regard. After consulting with Amin and Hassan, Lipsig investigated the Dahlawis' concern that Ramlawi had mismanaged the various partnership companies. Lipsig also drafted the termination agreement that was presented to Ramlawi for his signature. Clearly, all of Lipsig's activities were within the scope of his agency as the Dahlawi family attorney.
Ramlawi, however, argues that Lipsig had a personal stake in attempting to interfere with the partnership agreement that he had with the Dahlawis. Specifically, Ramlawi claims that if he was excluded from the partnership then Lipsig would have a larger role in the management of the projects in Florida and Lipsig would be able to avenge himself against Ramlawi for previous injuries. Importantly, other than Ramlawi's speculation in this regard, there is absolutely no proof that Lipsig would have been given a larger management role or that he had any motive to avenge prior injuries. Thus, a directed verdict in favor of Lipsig should have been granted on the conspiracy and tortious interference claims. See Leasing Serv. Corp. v. American Motorists Ins. Co., 496 So.2d 847, 850 (Fla. 4th DCA 1986) (concluding that "[a] directed verdict is appropriate on the issue of theft when only speculation and conjecture are placed before the jury."); see also Brinkley v. Brinkley, 453 So.2d 941, 943 (Fla. 4th DCA 1984)(holding that "[c]onclusions or opinions based on pure speculation are worthless to the trier of fact.") (see citations therein).

2. Rahman's Status
Likewise, at the time that the alleged conspirators conspired against Ramlawi to exclude him from the partnership, Rahman was employed by Zaminco. Rahman was working in Miami on one of the partnership projects when Lipsig informed Rahman that he would be transferred to Saudi Arabia. Ramlawi maintains that Rahman had a personal stake in conspiring to remove him from the partnershipto escape the miserable living conditions of Saudi Arabia. If Ramlawi was excluded from the partnership, then Rahman could replace Ramlawi back in Miami. Once more, this is pure speculation. The reason why Amin initially went into business with Ramlawi is because he possessed superior business skills. There was no evidence that Rahman was capable of filling Ramlawi's "formidable business shoes." Moreover, the record is devoid of any evidence, other than Ramlawi's speculation, that Rahman would replace Ramlawi upon Ramlawi's removal from the partnership. In light of Ramlawi's speculative testimony in this regard, we again conclude that the trial court should have granted a directed verdict in Rahman's favor on this count. See Leasing Serv. Corp., 496 So.2d at 850; Brinkley, 453 So.2d at 943.

*182 D. The Slander Issues.
The appellants also argue that the trial court erred in failing to direct a verdict in their favor on Ramlawi's slander counts. Paragraph 29 of Ramlawi's Amended Counterclaim provides:
Starting in 1990, Amin Dahlawi, Hassan Dahlawi, Lipsig and Rahman have defamed Ramlawi throughout the City of Miami, among other places, by falsely and maliciously calling him derogatory names, including: (a) a "crook," (b) a "thief"; (c) a poor businessman; (d) an "embezzler"; and (e) have alleged that he has received "kickbacks." Lipsig and Rahman have done this upon the instructions of, and/or with the knowledge and consent of, the Dahlawis.
Ultimately, the jury found that three of the alleged statements that Ramlawi complained about were slanderous: a statement made by Lipsig to Tony Angelos[10]; a statement made by Amin to Gerald Zadikoff[11]; and a statement made by Rahman to Gerald Zadikoff. The jury awarded Ramlawi $175,000 for each of the slanderous statements. The jury also found that Lipsig and Rahman were "personally employed" by Amin and Hassan, and thus the Dahlawis were held vicariously liable for Lipsig's and Rahman's defamatory statements. Finally, the jury also found that Amin Dahlawi, Lipsig and Rahman were liable for punitive damages as a result of the defamatory statements.
The appellants claim, as a matter of law, that none of the statements constituted actionable slander; that Amin and Hassan Dahlawi could not be vicariously liable for the defamatory statements made by Lipsig and Rahman, and that award of the punitive damages was improper. Each of these arguments will be addressed, in turn, below.
Lipsig, a retired lawyer, who advised the Dahlawis in both legal and non-legal matters, met with Tony Angelos. Angelos testified that in 1990 Lipsig told him that Ramlawi had taken money from Zaminco and from other partnership companies, thus resulting in Dahlawi and Ramlawi parting company. Lipsig denied making any such comment.
Also in June 1990, Gerald Zadikoff, a former Zaminco employee, supposedly stopped by the Zaminco offices to "chat". While there, he spoke with Rahman, Ramlawi's former assistant. When Zadikoff inquired about Ramlawi, Rahman told him that Ramlawi was "a thief" who had misappropriated corporate money for use on his personal condominium. At trial, Rahman denied having made such statement.
1. The Statements Were Properly Placed Before Jury.
a. Statements made by Lipsig to Angelos.
By its verdict, the jury made two findings with respect to Lipsig's statements: (1) that Lipsig told Tony Angelos that Ramlawi had a problem with money missing and that Ramlawi and the Dahlawis parted company because Ramlawi took money from the different partnership companies without authorization; and (2) that these statements were defamatory. The appellants argue that these findings cannot stand because Lipsig's statements were literally true and that truth is an absolute defense to defamation.
The appellants' argument is premised on a March 30, 1990 letter in which Ramlawi allegedly admitted taking money from the partnership's companies without authorization. Specifically, this letter provided that:
As to Ram Holding, it is a company that owns my condominium and as to the *183 loans, they have not been authorized prior, but have been discussed with yourself at the Hollywood office and at the Hyatt Regency Club at the time when we were discussing and reviewing this balance sheet in August of 1988. As far as interest is concerned, it is by law that no officer or director can have an interest free loan. This is governed by an IRS ruling that any loan to an Officer or Director must bear interest no less than the IRS charges.
At trial, Ramlawi admitted writing and sending this letter to the Dahlawis, who admitted that they shared the letter with their counsel, Lipsig.
Without question, Lipsig's statements to Angelos clearly implied that Ramlawi had wrongfully taken money from the partnership's companies which resulted in his expulsion from the partnership. However, other evidence presented at trial showed that Ramlawi's actions were in accord with a long-standing corporate policy which paid the expenses of the partnership companies' officers and shareholders, and to advance monies and make loans to these individuals as a matter of course without any need for prior authorization. Moreover, the evidence also showed that Lipsig and the Dahlawis had knowledge of these policies and loans years before Lipsig ever made his statements to Tony Angelos.
In light of Lipsig's omission of facts that would have eliminated the defamatory implication of his statement to Angelos, and since the evidence created a fact issue as to whether Lipsig's statements were false and defamatory, the trial court properly submitted the issue of slander to the jury. See Healy v. Suntrust Serv. Corp., 569 So.2d 458, 460 (Fla. 5th DCA 1990)(employer's statement that plaintiff/employee had been discharged for misappropriating funds could be equated to an accusation of theft, and since plaintiff had no intent to steal but had merely failed to follow defendant's procedure, the statement was not true and plaintiff was entitled to a directed verdict precluding the affirmative defenses of truth and good motives). See also, e.g., Glickman v. Potamkin, 454 So.2d 612, 613 (Fla. 3d DCA 1984)(summary judgment not proper where issue of `truth' presented factual question for jury); Drennen v. Westinghouse Elec. Corp., 328 So.2d 52, 55 (Fla. 1st DCA 1976)(directed verdict for defendant on truth defense reversed where plaintiff presented sufficient evidence to submit `issue of truth' to the jury).
Moreover, under Florida law, truth is only a defense to defamation when the truth has been coupled with good motive. See Axelrod v. Califano, 357 So.2d 1048, 1050 (Fla. 1st DCA 1978)(holding that "the truth of the publication is a good defense, assuming that it was made with good motives."). The law is clear that both truth and good motives are issues for the jury. See, e.g., Glickman, 454 So.2d at 613; Drennen, 328 So.2d at 55.
Here, as shown above, there was a question of fact as to whether Lipsig told Angelos the "whole truth". Furthermore, there was also a question of fact as to whether Lipsig's motives were "good" when he told Angelos that Ramlawi took money from the partnership's companies without permission. Accordingly, the trial court was correct in refusing to direct a verdict, and submitting this claim to the jury for determination.
b. Rahman's Statement that Ramlawi was a "Thief".
Similar to the argument above, the appellants claim that Rahman's statement to Gerald Zadikoff, referring to Ramlawi as a "thief", was not defamatory because the statement was true, since Ramlawi admitted to using company money without prior authorization.
Here, as with Lipsig and Angelos, Rahman did not accurately present the totality of the applicable facts to Zadikoff. Instead, Rahman merely stated that Ramlawi used company money in furnishing his condominium. He did not tell Zadikoff that Ramlawi was acting in accordance *184 with long-standing company policy and that the expenditures discussed were disclosed and acquiesced to by the Dahlawis. In short, Rahman failed to accurately or completely provide the applicable facts to Zadikoff. Thus, Rahman's omission of certain facts properly made his statements an issue for the jury's determination.
The appellants also argue that Rahman's statement to Zadikoff was nonactionable because it was "pure opinion." A statement is "pure opinion" only if the speaker states the facts on which he bases his opinion. See From v. Tallahassee Democrat, Inc., 400 So.2d 52, 57 (Fla. 1st DCA 1981)(holding that pure opinion cannot constitute actionable defamation. "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public."). However, a speaker cannot invoke a "pure opinion" defense, if the facts underlying the opinion are false or inaccurately presented. See Zambrano v. Devanesan, 484 So.2d 603, 606 (Fla. 4th DCA 1986)(stating that the pertinent question is "whether the speaker accurately presented the underlying facts of the situation before making the allegedly defamatory remarks."); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)(holding that even if the speaker states the facts upon which he bases his opinion, the statement may still imply false assertions of fact if those facts are incorrect, incomplete or the speaker's assessment of the facts is erroneous).
As previously discussed, Rahman failed to provide Zadikoff with an accurate or complete set of the underlying facts. Thus, Rahman is precluded from "pure opinion" protection. Accordingly, the trial court properly submitted this issue to the jury for its determination. See Healy, 569 So.2d at 461 (jury question existed in defamation action as to bank official's purpose in advising other bank employees that employee had been discharged for misappropriating funds).
c. Amin Dahlawi's statement to Zadikoff that Ramlawi had mismanaged the partnership companies.
The appellants also argue that a directed verdict should have been granted on the defamation count against Amin because Ramlawi failed to prove that Amin had made a defamatory statement about him since he was unable to establish exactly what Amin had said to Zadikoff. At trial, Zadikoff testified that:
Mr. Dahlawi implied that Ramlawi had mismanaged the companies. Again exact words, I don't think it was that, but that's the impression I got. He was very disappointed because he felt that there was some mismanagement taking place.
Thus, since Zadikoff did not recall Amin's exact words, the appellants argue that Ramlawi did not prove that Amin had actually made a defamatory statement. The appellants are wrong.
This court has expressly held that a defamatory statement does not need to be accounted for "verbatim" to state a cause of action for slander. Edward L. Nezelek, Inc. v. Sunbeam Television Corp., 413 So.2d 51, 55 (Fla. 3d DCA 1982). In Nezelek, this court noted that:
[t]he general rule in Florida is that allegedly defamatory words should be set out in the complaint for the purpose of fixing the character of the alleged libelous publication as being libel as per se. That a plaintiff `set out' allegedly defamatory words, does not necessarily require that the statements be set out verbatim. This is particularly true where the statements may not easily be retained because they were made orally either in conversation or by radio or television broadcast.... Accordingly, we hold that when the cause of action for defamation is based on oral statements, *185 it is sufficient that the plaintiff set out the substance of the spoken words with sufficient particularity to enable the court to determine whether the publication was defamatory.
Id. (citations omitted). See also, e.g., Itri v. Lewis, 281 Pa.Super. 521, 422 A.2d 591, 592 (1980) (in slander cases, substance or purport of what was said is sufficient). This same rule applies at trial, i.e., proof of the exact words spoken is not a prerequisite to recovery for slander. Indeed, if at trial the witnesses recall the gist of the conversations rather than precise language, it is the function of the jury to ascribe weight to the inexactness of such complaints. Newark Trust Co. v. Bruwer, 141 A.2d 615, 616-17 (Del.1958) (claim properly submitted to jury even where witness' recollection of details of slanderous conversation was hazy); Boeckle v. Masse, 5 S.W.2d 195, 197 (Tex.Ct.App. 1928) (recovery for slander not dependent on "proof of exact language").
Here, Zadikoff testified regarding the substance of Amin's statementsthat Ramlawi had mismanaged the partnership's companies. The jury was instructed to consider the witnesses' ability to remember the matters about which he or she testified in determining the weight to be given any witnesses' testimony, see Florida Standard Jury Instruction (Civil) 2.2(a), and the jury found that Amin had in fact made a slanderous statement about Ramlawi.
The appellants also argue that Amin's accusation that Ramlawi "mismanaged" the partnership's companies was not actionable because the statement constituted "pure opinion." For the same reasons discussed above, we disagree. Instead, we find that Amin's statement implied the existence of undisclosed defamatory facts, and as such was actionable. Here, Amin told Zadikoff that Ramlawi, who was in charge of running virtually every aspect of the partnership and businesses, had mismanaged them both. Amin clearly imputed to Ramlawi conduct incompatible with the proper exercise of his business, and accordingly this accusation was slanderous per se. See Teare v. Local Union No. 295, 98 So.2d 79, 82 (Fla.1957) (holding that an oral communication is actionable per se if it imputes to another "conduct, characteristics or a condition incompatible with the proper exercise of his lawful business, trade, profession or office."); Scholz v. RDV Sports, Inc., 710 So.2d 618, 625 (Fla. 5th DCA)(holding that slander is per se actionable where people hearing the comment "`might have taken it to mean that the plaintiff was a person with whom commercial relations were undesirable.'") (quoting Wolfson v. Kirk, 273 So.2d 774, 778 (Fla. 4th DCA 1973)), rev. denied, 718 So.2d 170 (Fla.1998).
Thus, the trial court did not err in refusing to rule as a matter of law that Amin's statement was "pure opinion" and this issue was properly given to the jury.
2. Amin and Hassan Dahlawi's vicarious liability for the slanderous statements of Lipsig and Rahman.
The jury found that Amin and Hassan Dahlawi "personally employed" both Lipsig and Rahman, and thus found them to be vicariously liable for the defamatory statements made by Lipsig and Rahman.[12] The jury did so based upon the trial court's instruction that "personal employment" depended on a showing that "Lipsig and/or Rahman were agents or employees of Amin Dahlawi and Hassan Dahlawi ... acting within the scope of their employment at the time the statements were made."[13] Thus, the sole theory of liability *186 presented against Amin and Hassan Dahlawi on this issue was vicarious in nature.
a. Lipsig's status.
The record evidence regarding Lipsig's relationship with Amin and Hassan Dahlawi shows that Lipsig was the Dahlawi family's attorney with regard to their business ventures. Professionals, such as lawyers and accountants are always agents of their clients; but at times serve in such other capacities as independent contractors, and/or employees. As recognized in the Restatement:
`[I]ndependent contractor' is a term which is antithetical to the word `servant', although not to the word `agent'. In fact, most of the persons known as agents, that is, brokers, factors, attorneys, collection agencies, and selling agencies are independent contractors as the term is used in the Restatement of this Subject, since they are contractors but, although employed to perform services, are not subject to the control or right to control of the principal with respect to their physical conduct in the performance of the services. However, they fall within the category of agents. They are fiduciaries; they owe to the principal the basic obligations of agency: loyalty and obedience. Some of them also fall within the category of trustee, as in the case of a selling agent who has been given title to the subject matter. Colloquial use of the term excludes independent contractor from the category of agent as a similar use excludes trustee, but in both cases there is an agency if in the transaction which they undertake they act for the benefit of another and subject to his control.
Restatement (Second) of Agency § 14N, cmt. a (1958).
Similarly, Florida law also uniformly holds that, in the absence of evidence to the contrary, an attorney in Florida has the actual and apparent authority to speak and to act for his client only in those matters necessary or incidental to the accomplishment of the purpose of the lawyer's retention. See, e.g., State ex rel. Personal Finance Co. v. Lewis, 140 Fla. 86, 191 So. 295, 296 (1939) (reasoning that "... in matters of procedure or practice which affect solely the conduct of a cause, an attorney may bind his client ... [.]"); Johnson v. Estate of Fraedrich, 472 So.2d 1266, 1268 (Fla. 1st DCA 1985) (holding that "[A]n attorney is generally viewed as the agent of his client. An act done by an agent on behalf of the principal within the scope of the agency is not the act of the agent but of the person by whose direction it is done.") (citations omitted); Mendelsund v. Southern-Aire Coats of Fla., Inc., 210 So.2d 229, 231 (Fla. 3d DCA 1968) (holding that "there is a presumption that an attorney, as an officer of the court, is duly authorized to act for a client whom he professes to represent."); Epperson v. Rupp, 157 So.2d 537, 538 (Fla. 3d DCA 1963) (reasoning that "an attorney is an agent for his client" and accordingly, for example in probate proceedings, the attorney can "sign an `objection' to a claim, the same as he may institute a suit for a client without the client's signature or file a claim in an estate without the client's signature.").
Here, there is no record evidence that Lipsig's responsibilities in any way included discussions with Tony Angelos concerning Ramlawi's administration of the partnership's companies. As the record discloses, Lipsig's statement was an expression of his own personal opinions to a third party, Angelos, about Ramlawi's management style. Such statement, clearly had nothing to do with the performance of Lipsig's legal services for the Dahlawi family. Thus, there is no evidence that Lipsig's statement was made within the scope of his authority as the Dahlawis' attorney.
Accordingly, the trial court erred when it failed to direct a verdict for Amin and Hassan on the vicarious liability claim regarding Lipsig's statement, and therefore, that portion of the jury's verdict is reversed.

*187 b. Rahman's status.
As stated earlier, Zaminco was formed in 1980, in Michigan by Ramlawi and the Dahlawis with the initial intention of exporting products from the United States to Saudi Arabia. At trial, and on appeal, Ramlawi has argued that Rahman was a personal employee of either Amin or Hassan. However, Ramlawi concedes that Rahman was also an employee of Zaminco. The statement that Rahman made to Zadikoff occurred at Zaminco's offices. Thus, it appears to us that the statement was made to Zadikoff while Rahman was acting as a Zaminco employee. Accordingly, the only way that Amin or Hassan could personally be held vicariously liable for Rahman's statements would be if there was a reason to pierce Zaminco's corporate veil.
Under Florida law, the mere ownership of a corporation by a handful of shareholders is an insufficient reason to pierce the corporate veil and hold shareholders individually liable for a corporate employee's errors. See, e.g., Advertects, Inc. v. Sawyer Indus., 84 So.2d 21, 23 (Fla.1955) (holding that "[t]he mere fact that one or two individuals own and control the stock structure of a corporation does not lead inevitably to the conclusion that the corporate entity is a fraud or that it is necessarily the alter ego of its stockholders to the extent that the debts of the corporation should be imposed upon them personally."). Moreover, even if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained. See Mayer v. Eastwood, Smith & Co., Inc., 122 Fla. 34, 42, 164 So. 684, 687 (1935) (holding that "[s]o long as proper use is made of the fiction that [the] corporation is [an] entity apart from stockholders, [the] fiction will not be ignored.") (citation omitted).
"A critical issue in the determination of whether the corporate veil will be pierced for the imposition of personal liability is whether the corporate entity was organized or operated for an improper or fraudulent purpose." Kanov v. Bitz, 660 So.2d 1165, 1166 (Fla. 3d DCA 1995). Thus, unless there is a showing that a corporation was formed, or at least employed, for an unlawful or improper purpose as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust, the corporate veil cannot be pierced. See Aztec Motel, Inc. v. State ex rel. Faircloth, 251 So.2d 849, 852 (Fla.1971) (holding that "courts will look through the screen of corporate entity to individuals who compose it in cases in which corporation is a mere device or sham to accomplish some ulterior purpose, or is a mere instrumentality or agent of another corporation or individual owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose"); see also Munder v. Circle One Condo., Inc., 596 So.2d 144, 145 (Fla. 4th DCA 1992) (directors, officers and stockholders may lose their insulation from liability for corporate acts if they engage in fraud, self-dealing, unjust enrichment or betrayal of trust).
There was no evidence whatsoever that ZamincoRahman's employerwas either formed or utilized for an illegal, unethical or improper purpose. In the absence of any such evidence, none of Zaminco's shareholders, including Amin and Hassan Dahlawi, could be held vicariously responsible for a corporate employee's tortious conduct. Thus, the trial court was required to direct a verdict for Amin and Hassan Dahlawi on the theory of vicarious liability for the alleged statement of Rahman. Accordingly, that portion of the jury's verdict is also reversed.
E. Punitive Damages Issues
1. The punitive damage awards assessed against Lipsig and Rahman should have been reduced.
Lipsig and Rahman argue that the trial judge erred in failing to grant a directed *188 verdict in their favor on the issue of punitive damages for the slander claim or, alternatively, by failing to substantially remit the punitive damage awards. We cannot agree that the trial judge erred by not granting a directed verdict on the issue of punitive damages, because there was evidence presented at trial that made the issue one for the jury to decide. We do, however, agree that the trial judge erred by not further reducing the punitive damage award.
At the punitive damages portion of the trial, Rahman presented evidence that his net worth was $18,000 and Lipsig offered proof that his net worth was $468,679.93. At the conclusion of the trial, the jury awarded Ramlawi $4,000,000 for Lipsig's slanderous statements against Ramlawi and the same amount was awarded to Ramlawi for Rahman's defaming statements. A motion for remittitur was filed and the trial court reduced the punitive damages award to three times the amount of compensatory damages pursuant to section 768.73, Florida Statutes (1993).[14] As previously stated, the jury had earlier awarded compensatory damages in the amount of $175,000 against both Lipsig and Rahman, individually. Thus, Lipsig and Rahman were each assessed punitive damages totaling three times this amount.
Lipsig and Rahman argue that the punitive damages awards will lead to their financial demise and result in their economic castigation. On the record before us, we agree and hold that the trial judge erred by not further reducing the punitive damage awards.
While a punitive damage award should be painful enough to provide some retribution and deterrence, it should not be an amount which will financially destroy or bankrupt a defendant. See Arab Termite & Pest Control, Inc. v. Jenkins, 409 So.2d 1039, 1043 (Fla.1982). To illustrate, in Hockensmith v. Waxier, 524 So.2d 714 (Fla. 2d DCA 1988), the jury awarded the plaintiff $250,000 in punitive damages. This amount represented almost four times the defendant's unrebutted $67,400 net worth. The court held that the award was excessive, it concluded that punitive damages may not be assessed in an amount which will clearly bankrupt or destroy a defendant. Id. at 715. Indeed, this court has held that "[w]here a punitive damage award bears no relation to the defendant's ability to pay the same and results in economic castigation, it is certainly true that the courts may deem such an award to be excessive." Brooks v. Rios, 707 So.2d 374, 375 (Fla. 3d DCA 1998).
Here, like Hockensmith, Rahman's net worth evidence was unrebutted. Moreover, while the trial court did reduce the punitive damage award, the amount of the award is still almost thirty times Rahman's net worth. Thus, we remand for the trial court to remit the punitive damage award assessed against Rahman to reflect a reasonable relationship to his net worth and to his ability to pay.
*189 Likewise, the amount of punitive damages assessed against Lipsig must be remitted. Here, Lipsig's undisputed net worth is $468,679.93. Pursuant to the trial court's remittitur, he is required to pay $525,000 in punitive damages (plus $175,000 in actual damages). Clearly, even if Lipsig liquidated all of his assets, he would still owe Ramlawi nearly $232,000. Thus, this punitive damage award would also lead to Lipsig's financial demise. Accordingly, we find that the punitive damage award against Lipsig must also be adjusted to resemble a reasonable relationship to his net worth and his ability to pay.[15]
2. The punitive damage award against Amin Dahlawi
The verdict form, agreed to by Ramlawi, makes no distinction between any punitive damages assessed against Amin for his own slanderous statements or vicariously for the statements of Lipsig and Rahman.[16] Since we have held that Amin and/or Hassan Dahlawi should not have been held vicariously liable for Lipsig's and Rahman's statements, a new trial on the assessment of punitive damages against Amin Dahlawi, is required. See Litman v. Massachusetts Mut. Life Ins. Co., 739 F.2d 1549, 1562 (11th Cir.1984) (using Florida law, held that where punitive damage issue had gone to the jury on two different theories of liability, and the appellate court reversed the plaintiff's judgment as to one of those theories, the issue of punitive damages had to be retried).

F. Tortious Interference with the Antigua Property
Finally, the Dahlawis argue that the trial court erred in denying their motion for directed verdict on Ramlawi's count against them for their alleged tortious interference with an option agreement that Ramlawi had entered into to purchase a parcel of land in Antigua. We agree.
In 1986, Ramlawi visited the St. James's Club in Antigua. This property consisted of courtyard and beach homes, villas, and town houses which were available for sale. The St. James's Club was operated by a company which the Dahlawis owned named St. James's Club Antigua Ltd. On July 30, 1986, Ramlawi and an agent of St. James's Club entered into an option agreement with Amin Dahlawi present. Ramlawi deposited $1,600 as consideration for the option; this amount represented one *190 percent of the $160,000 sales price. Also, the option agreement, in clear and unambiguous terms, required Ramlawi to exercise the option, in writing, within 35 days of the date of the agreement.[17]
We agree with Dahlawi that this claim should never have been submitted to the jury where there was no evidence that Ramlawi ever sent written confirmation of his desire to exercise the option. In fact Ramlawi admitted in his deposition testimony that from the date in which he signed the option in July of 1986 to March or April of 1990, he did not have any discussion with, or contact with anyone about the St. James property.[18] Moreover, we note that Ramlawi never presented evidence concerning when Dahlawi purportedly sold the property or when he heard the rumor concerning the sale of the property.
Accordingly, we reverse any damages awarded to Ramlawi on this issue and remand with directions that the lower court enter a final judgment in favor of Dahlawi on this count.

III. Cross-Appeal

A. Attorney's Fees
Ramlawi moved for attorney's fees in conjunction with the partnership accounting performed by the court below. The trial court, although conceding that Ramlawi should be entitled to fees, denied Ramlawi's motion finding that it was bound by Cheek v. Bugg, 639 So.2d 144 (Fla. 5th DCA 1994), and accordingly it could not award fees to Ramlawi because he did not specifically plead an action for partnership dissolution.[19] Because we find Cheek, requiring an appraisal of the partnership's value, to be distinguishable from this case, we reverse and remand the trial court's denial of Ramlawi's motion for attorney's fees.
"The law in Florida is well-settled that attorney's fees are ordinarily not allowable as costs in the absence of contractual or statutory authority." Cooper v. Fulton, 158 So.2d 759, 762 (Fla. 3d DCA 1963). However,
[t]he general rule is that costs including attorney's fee will be allowed ... in cases of partnership accounting, but even in these cases, the matter is one vested largely in the discretion of the [trial court].
A.J. Richey Corp. v. Garvey, 132 Fla. 602, 182 So. 216, 219 (1938)(citing Wade v. Clower, 94 Fla. 817, 114 So. 548 (1927)). See also Donald S. Zuckerman, P.A. v. Alex Hofrichter, P.A., 632 So.2d 730, 731 (Fla. 3d DCA 1994) (in a suit for an accounting of a law partnership, party's award of attorney's fees affirmed where trial court properly applied Wade and Richey standard); Hiestand v. Geier, 396 So.2d 744, 749 (Fla. 3d DCA 1981) (trial court may award attorney's fees, absent contractual or statutory basis, where partner brings an action for accounting or business dissolution); Tobin v. Lefkowitz, 367 So.2d 682, 683 (Fla. 3d DCA 1979) (attorney's fees are awardable where "one *191 partner secures an accounting from another.").
Moreover, as the Supreme Court of Florida stated many years ago:
[a]s a rule the costs of a suit for a partnership accounting, including the fees of experts and of attorneys, are to be paid out of the partnership estate, or if this is insufficient they are to be borne by the partners in proportion to their respective partnership shares. But, as in other equity suits, the court may exercise discretion in the award of costs, and it not infrequently charges the entire costs to one or some of the partners [.]
Wade v. Clower, 114 So. at 552 (emphasis added). Here, in this case, although Ramlawi did not specifically bring a suit for a partnership accounting, an accounting was held by the implied consent of the parties.[20] As such we believe, as this court previously stated in Cooper, that
a review of the record before us ... presents an instance where the Florida Supreme Court has found [the exception pronounced in Wade and Richey] to apply. We do not, however, approve assessment of the fee as costs wherein to do so [would be] in the nature of a penalty.
158 So.2d at 762.
Thus, since we find that the trial court never reached the equities and merits of an attorney's fee award in the accounting portion of this case, we reverse the court's denial of attorney's fees and remand for the trial court to determine whether the equities here mandate an award of attorney's fees to Ramlawi.

B. Interest
The jury returned its verdicts in this case on December 16, 1994 and the appellants immediately, and before judgments were entered on the damage awards, filed a notice of appeal from the verdicts claiming that they were non-final orders in favor of a party seeking affirmative relief subject to rule 9.130, Florida Rules of Appellate Procedure. After the appeal was filed, no judgments were entered on any of the claims, including the fully adjudicated claims contained in verdicts 16-22.[21] While this appeal was still pending, the trial court conducted the accounting trial, and entered its order on the accounting issues. The last of these orders was entered August 9, 1996, but the trial judge declined to enter any final judgment on the accounting award due to pendency of the appeal.
That appeal was eventually dismissed in February 1997[22], more than two years after the jury's December 1994 verdicts were returned. When the appeal was finally dismissed, Ramlawi moved for entry of final judgment. In his motion, Ramlawi requested that post-judgment interest be awarded from the date of the jury's verdicts and the date of the court's accounting *192 orders because of the unwarranted delays caused by the Dahlawis' unauthorized appeal. The trial court denied the motion, and post-judgment interest did not begin to run on any of the awards until June 12, 1997, the date of the entry of final judgment was entered. That was two-and-a-half (2½) years after the jury had entered its verdict and nearly a year after the court entered its order on the accounting.

1. Post-Judgment Interest
On the cross-appeal, Ramlawi first argues that he is entitled to post-judgment interest on verdicts 9, 16-22 nunc pro tunc from the date of the jury's award of the same. He further states that he is entitled to post-judgment interest on the accounting award nunc pro tunc from the date of the trial court's order on the accounting phase of the trial. Ramlawi claims that anything less will deprive him of significant property and of being made whole. We agree.
The law is clear that "for purposes of assessing post-judgment interest, a claim becomes liquidated and subject to interest when a verdict or court decision has the effect of fixing entitlement ... [.]" Fischbach & Moore, Inc. v. McBro, Div. of McCarthy Bros. Co., 619 So.2d 324, 325 (Fla. 3d DCA 1993). Thus, we agree with Ramlawi and remand for the trial court to award post-judgment interest as to verdicts 9, 16-22, nunc pro tunc from the date of the jury's verdict and post-judgment interest on the accounting award nunc pro tunc from the date of the court's order on the accounting phase of the trial. See also Bailey v. Leatherman, 668 So.2d 232, 233 (Fla. 3d DCA 1996) (post-judgment interest award started to accrue on date that trial court determined that plaintiff was entitled to fees and costs, even if actual amount was not determined until later; plaintiff was not to be penalized because defendant appealed).

2. Pre-Judgment Interest.
Ramlawi next argues on the cross-appeal that he is entitled to prejudgment interest on verdicts 16-22. The law is clear that prejudgment interest is available to compensate a party for the wrongful deprivation of property, and to help make an injured party whole. See Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212, 214-15 (Fla.1985). However, it is also well settled that prejudgment interest is not available on non-economic damages, such as the damages to reputation awarded to Ramlawi on the slander counts. See Alvarado v. Rice, 614 So.2d 498, 499 (Fla.1993) (party is entitled to prejudgment interest when it is determined that party had suffered actual, out-of-pocket loss at some date prior to the entry of the judgment). Thus, we specifically hold that Ramlawi was not entitled to prejudgment interest on verdict 16, the award for slander.[23] Prejudgment interest, however, is available for actual out-of-pocket losses, and the claim for such losses becomes liquidated at the time the verdict fixes the date and amount of the loss. Argonaut Ins. Co., 474 So.2d at 214. Thus, we find that Ramlawi was entitled to prejudgment interest for verdicts 18-22, at the applicable statutory rate.
In addition to Ramlawi's general argument for prejudgment interest, Ramlawi has also raised, albeit in footnotes[24], a number of specific challenges to the various *193 prejudgment interest awards arguing that many of the jury's findings regarding the dates of loss were error. Finding that these arguments were not raised in the court below, and thus not preserved for appellate review, we decline to address them. See, e.g., Bohannon v. State, 546 So.2d 1081, 1082 (Fla. 3d DCA 1989) (objection to sending back written instruction was not an objection to sending back partial written instructions in violation of the rule); Mount Sinai Hosp. of Greater Miami v. Steiner, 426 So.2d 1154, 1155 (Fla. 3d DCA 1983) (general motion for mistrial for discharge of juror taking notes was not a specific objection to a continuation of trial with only five jurors). Accordingly, we affirm the trial court's award of prejudgment interest in verdicts 18-22.

IV. Conclusion

We find no merit to any other points on appeal and cross-appeal not specifically addressed therein. Thus, for all of the foregoing reasons, we affirm in part, reverse in part and remand with directions for the trial court to do all acts consistent with this opinion.
NOTES
[1] The Dahlawis will collectively be referred to as "the Dahlawis" whenever possible. If it becomes necessary to refer to them individually, the parties will be referred to by their first name, respectively.
[2] Special Verdict No. 9 reads:

a. Has Zahid Ramlawi proved that he and each of [sic] Amin Dahlawi, Hassan Dahlawi, and Diana Willis Dahlawi agreed that the following companies were intended to be part of the terms of the alleged partnership agreement?
 Vista Finance Corporation
 Yes: &check; No: ____
 Express Premium Finance, Inc.
 Yes: &check; No: ____
 American Vehicle Insurance Company
 Yes: &check; No: ____
 Miami Freedom Tower, Inc.
 Yes: &check; No: ____
 Miami Columbus, Inc.
 Yes: &check; No: ____
 Miami Center Associates, Ltd.
 Yes: ____ No: &check;
IF YOU ANSWERED "YES" TO ANY PART OF QUESTION (a), THEN ANSWER QUESTION (b). IF YOU ANSWERED "NO" TO ALL PARTS OF QUESTION (a), THEN GO TO QUESTION NO. 10.
b. State the percentage ownership of the following companies that Zahid Ramlawi has under the alleged partnership agreement.

Vista Finance Corporation 30%
Express Premium Finance, Inc. 30%
American Vehicle Insurance Company 30%
Miami Freedom Tower, Inc. 30%
Miami Columbus, Inc. 30%
Miami Center Associates, Ltd. 0%

[3] Rule 9.130 permits appellate review of specific non-final orders and provides in pertinent part:

* * *
(3) Review of non-final orders of lower tribunals is limited to those that
* * *
(C) determine
* * *
(iv) the issue of liability in favor of a party seeking affirmative relief[.]
Fla. R.App. P. 9.130(a)(3)(C)(iv).
[4] The parties all agree that Michigan's partnership law applies to this case.
[5] Ramlawi consulted a lawyer that he knew, told the lawyer that he and Amin were going to be partners in various ventures, and sought advise on how to carry out the different projects under a corporate umbrella. Ramlawi also began arranging meetings with business prospects. In fact, Ramlawi and Amin met with an executive from Ford Motor Company; a representative from a carpet mill as well as number of representatives from construction companies and other businesses about different projects.
[6] Zaminco International, Inc. was formed as a Michigan corporation with Amin Dahlawi as chairman of the board; Ramlawi as president and vice-chairman of the board; and Hassan Dahlawi as vice-president. Shares in the corporation were distributed in the same manner as the partnership interests, and all four shareholders became directors.
[7] See supra note 2.
[8] "A suit for partnership accounting is a proceeding in equity." 8A Fla. Jur.2d Business Relationships § 755 (1996).
[9] Specifically, verdict 18 found that Express Premium owed a net payment of $80,500 to Ramlawi under an agreement between Express and Aminco/Zaminco; verdict 21 found that Aminco/Zaminco owed Ramlawi $150,000 for vacation and severance benefits; and verdict 22 found that Aminco/Zaminco owed Ramlawi $235,000 for monies that Ramlawi had fronted.
[10] Tony Angelos was an officer and director of Vista Finance. In 1982, Angelos left Vista following some disagreements with Amin.
[11] Gerald Zadikoff was an engineer from South Africa who at various times had worked on projects at the Hyatt Hotel, the Freedom Tower and the Columbus Hotel.
[12] It should be noted that the final judgment does not include the jury's finding of vicarious liability on the part of Amin and Hassan.
[13] The trial court defined an agent or employee as "a person who's employed to act for another and whose actions are controlled by his employer or subject to his employer's rights of control."
[14] Section 768.73 provides in pertinent part:

(1)(a) In any civil action based on negligence, strict liability, products liability, misconduct in commercial transactions, professional liability, or breach of warranty, and involving willful, wanton, or gross misconduct, the judgment for the total amount of punitive damages awarded to a claimant may not exceed three times the amount of compensatory damages awarded to each person entitled thereto by the trier of fact, except as provided in paragraph (b). However, this subsection does not apply to any class action.
(b) If any award for punitive damages exceeds the limitation specified in paragraph (a), the award is presumed to be excessive and the defendant is entitled to remittitur of the amount in excess of the limitation unless the claimant demonstrates to the court by clear and convincing evidence that the award is not excessive in light of the facts and circumstances which were presented to the trier of fact.
* * * *
(2) The jury may neither be instructed nor informed as to the provisions of this section.
§ 768.73, Fla. Stat. (1993).
[15] Our disposition of this issue necessarily moots out Ramlawi's argument on the cross-appeal that the trial court erred by reducing the punitive damage awards to three times the amount of the compensatory damages pursuant to § 768.73(1)(a), Florida Statutes.
[16] Special Verdict No. 16, provides in pertinent part:

a. Did Zahid Ramlawi prove that he was slandered by false statements of fact communicated about him to third persons?
 Yes: &check; No.: ____
b. Who do you find slandered Ramlawi, based upon the statements described in the Court's instructions?
&check; (i) Daniel Lipsig's alleged statement to
 Tony Angelos.
___ (ii) Amin Dahlawi's alleged statement
 to Steven Seepaul.
&check; (iii) Amin Dahlawi's alleged statement
 to Gerald Zadikoff.
___ (iv) Nasim Rahman's alleged statement
 to Gerald Zadikoff
c. If you checked any statements in (b) above, indicate the total amount of damages that Zahid Ramlawi has proved to have suffered as a result of any of the defamatory statements.

 (i) Daniel Lipsig $175,000
 --------
 (ii) Amin Dahlawi $175,000
 --------
(iii) Nasim Rahman $175,000
 --------

* * *
e. Are any of the parties below liable for punitive damages as described in the court's instructions?
 Amin Dahlawi
 Yes: &check; No: ____
 Hassan Dahlawi
 Yes: ____ No: &check;
 Daniel Lipsig
 Yes: &check; No: ____
 Nasim Rahman
 Yes: &check; No: ____

[17] Paragraph two of the option contract specifically required that:

2. The said option shall be exerciseable [sic] by notice in writing to SJC [St. James's Club] at any time within 35 days from the date hereof [July 30, 1986] and if the same shall be exercised then SJC shall sell the said property to the Purchaser for the said estate at the Purchase Price upon the terms hereinafter mentioned.
[18] Ramlawi testified as follows:

Q. OK. Well, from July 30, 1986, when you gave this $1,600 deposit, until March or April of 1990, did you ever have any discussions with or contact with anyone regarding your contract to buy this piece of land?
A. I haven't heard anything from St. James, no.
[19] In Cheek, the fifth district held that Bugg, the prevailing partner in a breach of partnership action, was not entitled to attorney's fees because he did not specifically bring an action for dissolution of the partnership and because the partnership agreement required an appraisal rather than an accounting of the partnership's value. 639 So.2d at 146-47.
[20] Furthermore, a dissolution of partnership action, which Dahlawi argues is necessary (in conjunction with an accounting) to be entitled to received attorney's fees under the exception to the general rule, was also tried here by implied consent. Thus, even if Dahlawi's interpretation of Cheek was accurate, which we deny, both a dissolution and accounting were tried in this case and thus, Ramlawi is entitled to a hearing on whether the equities entitle him to attorney's fees.
[21] Verdict 16 is against Lipsig, Rahman, Amin, and Hassan for slander; verdict 17 was against Amin for tortious interference with the Antiqua land sale; verdict 18 was for money owed Ramlawi under contract between Aminco and Express Premium Finance, Inc.; verdict 19 was for money owed Ramlawi, under a contract between Miami Center Associates, Ltd., and Aminco; verdict 20 was for money owed by the Dahlawis personally to Ramlawi; verdict 21 was for money owed by Aminco to Ramlawi for severance and vacation pay; and verdict 22 was for repayment of money that Ramlawi advanced to Aminco. None of these verdicts were included in the partnership accounting portion of the final judgment but were listed in the final judgment separately from the partnership accounting award.
[22] Ramlawi, 687 So.2d at 1379.
[23] Moreover, since we have held that a directed verdict in the Dahlawis favor should have been entered in Ramlawis claim for tortious interference with non-partnership related land sale (verdict 17), we also obviously find that Ramlawi was not entitled to prejudgment interest on that damage award.
[24] See R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39, 41 n. 1 (Fla. 3d DCA 1996) (concluding that "[i]t is elementary that arguments which are not made as a point on appeal, as here, but are found only in footnote in the appellant's brief, are not properly presented to the appellate court for review") (citing Florida Ass'n of Nurse Anesthetists v. Department of Prof. Reg., 500 So.2d 324, 327 (Fla. 1st DCA 1986)).