[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 10-15113

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 26, 2012
JOHN LEY
CLERK

D. C. Docket No. 1:08-cv-21791-ASG

KARL ECKHARDT,

Plaintiff-Counter
Defendant-Appellant,

versus

UNITED STATES OF AMERICA,

Defendant-Counter
Claimant-Appellee,

KIM ECKHARDT,

Defendant-Counter
Defendant-Appellee,

ARTHUR P. GIRARD,

Counter-Defendant.

Appeal from the United States District Court
for the Southern District of Florida

(March 26, 2012)

Before DUBINA, Chief Judge, ANDERSON and KLEINFELD,[*] Circuit Judges.

PER CURIAM:

This is an appeal from the district court's amended final judgment awarding summary judgment to the United States ("the government"). The district court determined that Karl Eckhardt was the alter ego of Karl's Collision Center, Inc. ("KCCI"). Because we agree with the district court that there are no genuine issues of material fact, we affirm the grant of summary judgment in favor of the government.

## I.

Eckhardt has been in the automotive business since he graduated from high school. In 1997, Eckhardt became the sole owner of Arnold's Paint and Body, Inc. ("Arnold's"), an auto repair business formed by Arnold Nese in 1987 located on the property at issue in this suit.[1] Kim, Eckhardt's wife, later became vice president of the corporation. On March 2, 2001, the IRS filed a Notice of Federal Tax Lien for taxes owed by Arnold's. Nine months later, on December 12, 2001, Eckhardt formed KCCI. Arnold's was administratively dissolved by the State of Florida on October 4, 2002.

---

[*]Honorable Andrew J. Kleinfeld, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]At that time, Eckhardt executed a $65,000 mortgage in favor of Arnold Nese. The mortgage was later assigned to Arthur P. Girard, a third-party defendant in the case below.

Eckhardt was the sole owner of KCCI and served as president. His wife served as vice president. KCCI was a paint and body auto shop operated by Eckhardt on the subject property, just like Arnold's. KCCI's corporate account and the Eckhardts' personal accounts were maintained at the same bank, City National Bank of Florida. Over the years, many transfers took place from KCCI's account to the Eckhardts' mortgage and personal checking accounts. Eckhardt also wrote himself checks from KCCI's corporate account.

In 2004, a transfer of $7,240 was made from KCCI's account to the Eckhardts' mortgage account and $15,635 was transferred to their personal checking account.[2] On July 28, 2004, Eckhardt wrote himself a check for the amount of $5,453.26 from KCCI's corporate account. On July 29, 2004, he wrote a check to City National Bank from his mortgage account for an almost-identical amount of $5,458.26. Eckhardt could not explain these payments during his deposition but stated that he believed the latter check to be a mortgage payment for his personal residence.

_____

[2]Eckhardt disputes this fact in the statement of disputed facts but states that "Karl Eckhardt nor Kim Eckhardt 'transferred' any funds as alleged. It was the consistent testimony of the Eckhardts that the bank automatically made the transfers; and that they were not aware of any agreement authorizing such transfers, nor did either of them initiate any of the referenced transfers." [R. 104-2 at 6.] Thus, Eckhardt only disputes that he personally transferred the funds but acknowledges that the funds were transferred.

In 2005, $26,855 was transferred from KCCI's account to the Eckhardts' mortgage account and $18,303.45 to their personal account. In 2006, $30,460 was transferred from KCCI's account to the Eckhardts' mortgage account and $6,115 to their personal account. Between April 28, 2006 and November 17, 2006, Eckhardt paid $21,800 from KCCI's account toward the mortgage on the property. Lease payments on a car leased to Eckhardt's wife were made from KCCI's corporate account, as well as car insurance on a Ford Thunderbird for the Eckhardts' personal use.

Soon after its incorporation, KCCI incurred employment tax liabilities and the IRS tried unsuccessfully to collect from KCCI. In August 2005, KCCI owed employment taxes for the first and fourth quarters of 2002, all four quarters of 2003, and the first and second quarters of 2004. On June 22, 2005, the IRS assessed trust fund recovery penalties against the Eckhardts pursuant to 26 U.S.C. § 6672 as responsible officers of KCCI. The Eckhardts paid these penalties. In January 2007, the IRS obtained an order authorizing Revenue Officer Elmer Davis to enter KCCI and seize property belonging to the taxpayer. The IRS seized cash, checks, and equipment and later sold the equipment.

On the day KCCI's assets were seized, Eckhardt's wife formed and incorporated NMB Collision Center, Inc. ("NMB"). Like Arnold's and KCCI,

4

NMB did not pay its employment taxes on time and as of September 23, 2009, NMB owed employment taxes for the first, second, and third quarters of 2008.

On May 11, 2007, the IRS filed a Notice of Federal Tax Lien against the Eckhardts as alter egos of KCCI. After levying on bank accounts and recovering proceeds through the seizure, some of KCCI's employment tax liabilties were paid. As of September 23, 2009, the assessed balance due from KCCI was $98,445.28, and it still owes taxes for the second, third, and fourth quarters of 2004 and the first, second, and third quarters of 2005.

Eckhardt brought suit against the government pursuant to 28 U.S.C. § 2410, seeking to quiet title to the property. The government filed a counterclaim against Eckhardt pursuant to I.R.C. § 7403 to foreclose the federal tax lien on the property. The government filed a motion for summary judgment, which the district court granted in part and denied in part. On July 7, 2010, the court found that Karl Eckhardt was the alter ego of KCCI, that the Notice of Federal Tax Lien against Eckhardt was valid, and that the government was entitled to enforce the lien against the property. An Amended Final Judgment was entered on July 30, 2010. Eckhardt filed this appeal to contest the district court's grant of summary judgment in favor of the government.

**II.**

We review a grant of summary judgment *de novo*. *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325 (11th Cir. 2001). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine factual dispute exists if the jury could return a verdict for the non-moving party." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (per curiam) (internal quotation marks omitted). The materials presented and all factual inferences must be viewed in the light most favorable to the non-moving party. *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970)). The question is "whether the evidence presents a sufficient disagreement to require submission to a jury [or] whether it is so one-sided that one party must prevail as a matter of law." *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir. 2004) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252, 106 S. Ct. 2505, 2512 (1986)).

### III.

Property held by an "alter ego" of the taxpayer is subject to collection for the taxpayer's tax liability. *See G. M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51, 97 S. Ct. 619, 627–28 (1977). Florida law governs the

6

determination of alter ego status in the context of federal tax liabilities. *Old W.*

*Annuity & Life Ins. Co. v. Apollo Grp.*, 605 F.3d 856, 862 (11th Cir. 2010) (per

curiam). Under Florida law, the corporate veil will only be pierced to prevent

fraud or injustice. *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1121

(Fla. 1984). Piercing the corporate veil is proper if the corporation "is a mere

device or sham to accomplish some ulterior purpose, or is a mere instrumentality

or agent of another corporation or individual owning all or most of its stock, or

where the purpose is to evade some statute or to accomplish some fraud or illegal

purpose." *Aztec Motel, Inc. v. Faircloth*, 251 So. 2d 849, 852 (Fla. 1971). To

pierce the corporate veil in Florida, a claimant must establish:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation;
>
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
>
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008) (per

curiam).

One important factor relevant to whether an individual dominates the

corporation to such an extent as to negate its separate identity is whether corporate

7

funds were used for the individual's benefit. *See Sykes*, 450 So. 2d at 1120. A showing of improper conduct is required to pierce the corporate veil. *Id.* at 1121. Mere ownership of a corporation by one shareholder is insufficient to pierce the corporate veil. *Gasparini*, 972 So. 2d at 1055. The veil will be pierced and the corporate entity disregarded if it is shown "that the corporation is formed or used for some illegal, fraudulent or other unjust purpose which justifies piercing the corporate veil. *Sykes*, 450 So. 2d at 1121 (quoting *Roberts' Fish Farm v. Spencer*, 153 So. 2d 718, 721 (Fla. 1963)). Improper conduct exists where a corporation is used "as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust." *Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. Dist. Ct. App. 2000). The alter ego issue is heavily fact-specific, but alter ego liability may be decided on summary judgment. *See Miller v. Harco Nat'l Ins. Co.*, 241 F.3d 1331, 1332–33 (11th Cir. 2001) (per curiam) (affirming grant of summary judgment that no material dispute existed as to whether individual and corporation were alter egos).

The record shows that the government has established the complete absence of any genuine issue of material fact in this case. Under Florida law, the government was required to prove that (1) Karl so dominated and controlled KCCI that the corporation had no separate existence; (2) KCCI was used for some

8

illegal, fraudulent, or other improper purpose; and (3) such alleged illegal, fraudulent, or improper purpose damaged the government. As the party asserting the alter ego theory, the government bears the burden of proof.

(1) *Domination and Control*

The government presented evidence that Eckhardt dominated and controlled KCCI. Eckhardt formed KCCI and was its sole owner and president. There is overwhelming evidence of commingled funds between Eckhardt and KCCI. It is undisputed from the record that more than 240 transfers were made from KCCI's corporate account to the Eckhardts' personal accounts totaling $107,000. It is also undisputed that Eckhardt wrote himself checks from the corporate account and that he used corporate funds to make a down payment on a Thunderbird car for the Eckhardts' personal use. Further, it is undisputed that Eckhardt wrote at least twenty-one checks, totaling $21,800, from the KCCI account to pay for a mortgage on the property.

Eckhardt asserts that there is no proof that the Eckhardts initiated any of the inter-account transfers. Contrary to Eckhardt's argument, the district court accepted the Eckhardts' testimony that they did not personally make any transfers. The district court never made a finding that the Eckhardts made the transfers, but only that the transfers occurred, as evidenced on the bank statements. Whether or

9

not the Eckhardts made the transfers or the transfers were automatically entered by the bank is irrelevant. What matters is that many transfers from KCCI's corporate account to the Eckhardts' personal accounts took place. Eckhardt argues that since he did not personally make the transfers, he did not have sufficient control over KCCI as an alter ego. Yet there is no evidence that Eckhardt attempted to stop the transfers or return the funds to the corporate account and there is evidence that Eckhardt used some of the money transferred for his benefit—the thunderbird car and mortgage payments.

Eckhardt argues on appeal that the fact that he wrote himself checks is irrelevant because he was president of KCCI and was entitled to payment for his services. However, there is no evidence to prove that the checks were written for Eckhardt's salary or for rent of the property that Eckhardt owned. In fact, Eckhardt testified during his deposition that he did not know why he had written himself a $7,500 check. Viewing the facts in a light most favorable to Eckhardt and assuming the checks were written for his salary or rent of the property, Eckhardt still does not escape alter ego liability because there is no dispute that Eckhardt made mortgage payments totaling $21,800 from KCCI's corporate account toward Arnold Nese's mortgage on the subject property. Eckhardt's admission that these "payments were made to Mr. Nese, directly by Karl's

Collision, as a matter of convenience, to avoid the necessity of writing one check from the corporation to Mr. Eckhardt, only to turn around and write an identical check to Mr. Nese," supports the government's argument Eckhardt did not respect the corporate form and that he commingled corporate funds. [R. 104-2 at 8.]

This evidence shows that Eckhardt dominated and controlled KCCI to such an extent that there was no meaningful difference between Eckhardt and the corporate form, KCCI. Although Eckhardt's status as president of KCCI is not sufficient to prove Eckhardt's control, we conclude that the evidence of his extensive use of corporate funds for his personal benefit supports the district court's conclusion that Eckhardt dominated and controlled KCCI as its alter ego.

(2) *Improper or Fraudulent Purpose*

The government adequately presented evidence that KCCI was used for the improper purpose of evading employment tax liabilities. Viewing the facts in a light most favorable to Eckhardt, there are no genuine issues of material fact on this issue.

Prior to KCCI's incorporation, Arnold's had unpaid employment tax liabilities. Nine months after the IRS filed a notice of federal tax lien against Arnold's, Eckhardt formed KCCI. KCCI also had unpaid employment tax liabilities from 2002 to 2005. During the time that KCCI had unpaid employment

11

tax liabilities, over one hundred thousand dollars was transferred from KCCI's corporate account to the Eckhardts' personal accounts. In addition, Eckhardt wrote himself checks from KCCI's corporate account without any indication that it was for payment of his services as president.

Contrary to Eckhardt's argument on appeal, the government was not required to show that the corporation was formed for an improper purpose. Florida law only requires that the corporation be *formed* or *used* for an improper or fraudulent purpose. Thus Eckhardt's argument that the government did not find fraud and did not look at the issue from a "fraudulent perspective" does not mean the alter ego analysis must end. The bank statements, checks, and history of KCCI's formation support the district court's conclusion that KCCI was *used* for an improper purpose. The government established that Eckhardt employed KCCI for an improper purpose—to evade payment of employment taxes.

(3) *Damage to the government*

The improper use of KCCI as a corporate form caused injury to the government by preventing the collection of outstanding employment tax liabilities from KCCI. By taking funds out of KCCI, Eckhardt deprived the corporation of any means to pay its taxes. The government adequately proved this element by its inability to collect taxes from KCCI.

## IV.

For the foregoing reasons, we affirm the grant of summary judgment.

**AFFIRMED.**

KLEINFELD, Senior Circuit Judge, dissenting:

I respectfully dissent.

To pierce the corporate veil in Florida, "the corporate form must have been used fraudulently or for an improper purpose."[1]  It is not enough that a corporation is thinly capitalized and improperly run.  The corporation must be organized or operated for an improper purpose to allow liability against shareholders.[2] "Thus, unless there is a showing that a corporation was formed, or at least employed, for an unlawful or improper purpose—as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust, the corporate veil cannot be pierced."[3]

Karl Eckhardt presented evidence sufficient to raise a genuine issue of material fact on this issue.  If Karl's Collision was formed and operated so that Karl could earn a living by doing auto body work, and its failure to pay taxes was because the business was poorly run, or Karl got sick, rather than because it was

---

[1]     Gasparini v. Pordomingo, 972 So. 2d 1052, 1055 (Fla. Dist. Ct. App. 2008).

[2]     Dania Jai-Alai Palace, Inc. v. Sykes, 450 So. 2d 1114, 1117 (Fla. 1984); Ally v. Naim, 581 So. 2d 961, 962–63 (Fla. Dist. Ct. App. 1991) (per curiam).

[3]     Lipsig v. Ramlawi, 760 So. 2d 170, 187 (Fla. Dist. Ct. App. 2000).

being operated for the purpose of evading taxes, then Karl would not be personally liable for the taxes on the corporation.

Karl's Collision did pay employment taxes before Karl got sick, and after he got sick, and paid at least some taxes while Karl was sick. During the time Karl's Collision failed to pay taxes, Karl was diagnosed with a rare chondoblastoma tumor on his ankle, for which he got five surgeries, resulting in a staphylococcus infection, and in Karl being heavily medicated. Business suffered without Karl, and the Eckhardts sold their home to reduce living expenses. Hurricane damage delayed their move to the cheaper home by four months, so they were homeless, living in a trailer with three children and a very sick father and husband. Although these facts do not excuse Karl's Collision from paying its employment taxes, they do permit a reasonable inference that the purpose of the business was not to evade taxes. A finder of fact could infer that the failure to pay was because Karl was sick and broke, not because he had schemed to use the corporate form to evade payment.

Karl Eckhardt and his wife, Kim, have personally expended significant funds as a result of Karl's Collision's unpaid employment taxes. They personally paid $76,000 against Karl's Collision's unpaid employment taxes in trust fund recovery penalties under 26 U.S.C. § 6672. They borrowed this money against

15

their personal residence to pay for the debts of Karl's Collision.  Further, the corporation was not dissolved voluntarily.  The government seized all of the assets of Karl's Collision and sold them, and then the State of Florida dissolved the corporation.  Kim averred in her declaration that she then borrowed money from her mother to buy back the assets seized from Karl's Collision to start her own auto body shop, NMB Collision, so that she could support the family and pay Karl's medical bills.  These facts permit a reasonable inference that this family sought to run a legitimate auto body shop despite their apparent inability to manage the finances.

As for corporate funds being used for personal expenses, the government does not claim "skimming" (hiding income under the guise of business expenses).  Without such a claim, there is no compelling inference that this bad bookkeeping method amounts to using the corporation fraudulently or for an improper purpose.  Since the Eckhardts owned all of the stock of the corporation, there would be no fraud or improper purpose against other shareholders.  So long as they did not hide income, there would be no fraud or improper purpose against the Internal Revenue Service in the nature of evading income tax.  For this close corporation to pay Karl's mortgage on the land would, as a practical matter for people unsophisticated in accounting, be like paying rent on the business premises.  That

16

does not support an inference of fraud. The Eckhardts submitted evidence that much of the personal use of the corporate account amounted to the bank transferring funds rather than the Eckhardts deciding to do it, as banks often do when someone has two accounts and one of them is overdrawn.

Since on summary judgment we are required to "view all the evidence and factual inferences therefrom in the light most favorable to the non-moving party,"[4] my view is that Karl Eckhardt has established a genuine issue of material fact and is entitled to try his case.

---

[4]  Miller v. King, 384 F.3d 1248, 1258–59 (11th Cir. 2004).